| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |
|---|---|---|

United States District Court
Southern District of Texas
**ENTERED**
August 31, 2016
David J. Bradley, Clerk

| Stetson Petroleum Corp., *et al.*, | § | |
|---|---|---|
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-14-1049 |
| | § | |
| Cathedral Energy Services, Inc., | § | |
| | § | |
| Defendant. | § | |

## Opinion on Partial Summary Judgment

1. *Introduction.*

   A well operator hired a contractor to drill a sidetrack well. The contractor's drilling plan relied on the operator's faulty data. Because the operator did not pay the contractor to audit the original data and the contract limits its liability, the operator will take nothing from the contractor.

2. *Background.*

   Stetson Petroleum Corp. is the operator of a well – the Coley 35-56 1st – and represents the owners, Excelsior Resources, Ltd., and R&R Royalty, Ltd. In 2013, Stetson asked Cathedral Energy Services, Inc., to replace its contractor and to drill a sidetrack well in Conecuh County, Alabama. Stetson's employee, Russ Hensley, gave Cathedral's employee, Harold Scholl, the survey data and the drill plan prepared by the original contractor.

   On July 25, Cathedral proposed its drill plan and sent Stetson its standard agreement, including the company's pricing and terms. It also sent its laborers and equipment to the well-site. Hensley called Scholl to accept the bid. The next day, Stetson completed its credit application. The application required Stetson's president, Pete Berg, to attest that Stetson had read Cathedral's terms, and agreed to be bound by them.

   On July 28, the drilling began. Cathedral's workers and sub-contractors manned and operated the rig to drill directionally. Stetson had a company man on site to protect the company's interest.

Cathedral used Stetson's surveys from the existing well to orient its drilling. Hensley says drilling a sidetrack well requires relying on the survey of the original well-bore. After spudding the well, Cathedral realized there was a problem. It told Stetson's company man that there was a discrepancy between Stetson's surveys and the positions of its tools – the tools were not where they were supposed to be in relation to the well.

Cathedral's technicians found that the discrepancy in data was caused by the original surveyor recording an erroneous value for the magnetic declination. Magnetic declination is used to correct the difference between true north and magnetic north; its value is dependent upon the location of the survey. Stetson's original surveyor used a positive 2.46 declination when it should have used negative 2.46. This mistake caused the location of original well-bore to be in a different place than shown in the survey; thus, the targeted well-bottom was also in a different place. After discovering this, Stetson says that Cathedral never suggested or proposed a revised well plan. Stetson did not tell Cathedral to stop drilling.

Cathedral followed, and deviated from, its plan. Drilling continued around the clock. From August 2, at 2:30 a.m., to August 4, 3:30 a.m., the crew took several surveys. The changes in the well-bore orientation were different than those prescribed in the well plan. On August 3, Stetson reviewed the update of the daily directional plan and found that despite having problems steering the well, Cathedral had continued to drill.

After Stetson asked Cathedral why it could steer the well, Cathedral revised its well plan to allow it to reach the corrected bottom-hole location. It is unclear if it mentioned the magnetic declination error, but Hensley remembers Cathedral describing the differences between the original surveys and the sidetrack. On August 19, 2013, Cathedral finished drilling the sidetrack and gave Stetson the bill for its services. Stetson tested it and determined that the well had bottomed in a oil-bearing zone.

Stetson says that Cathedral did not fulfill its contract because it failed to (a) attempt to reach the targeted location; (b) disclose material differences in the well-bore location; (c) get approval to deviate from the plan Stetson approved; and (d) failed to propose formally a revised plan.

After amending its complaint Stetson ultimately says that, because of Cathedral's breach, it lost its bargained benefit. It asks this court to put it in the economic position it would have been in if Cathedral would have performed as promised. It claims that it has suffered (a) unnecessary expenses to complete and operate the well; (b) costs to plug and abandon the well; and (c) costs to re-drill the well to the preferred bottom-hole location.

2. *Contract.*

The same elements are required to establish a binding contract, whether written or oral.[1] In the case of an express contract, the agreement is overtly stated. In an implied contract, agreement is inferred from the circumstances of the transaction.[2] A valid contract requires offer, acceptance, and consideration. A party accepts an offer when, having had an opportunity to appreciate the terms of the offer, it assents to its terms and agrees to be bound by them. Acceptance may be supported by papers – direct and collateral – conversations, and actions.

Cathedral made a specific offer to Stetson when its Scholl sent Hensley of Stetson the Directional/Horizontal Proposal on July 24, 2013. The proposal was prepared for the services Berg specifically requested from Cathedral. The proposal explicitly communicated the essential terms of the offer, including: (a) the number of days it was valid; (b) pricing for workers and equipment; (c) a detailed plan for the side-track well; and (d) Cathedral's terms and conditions.

Stetson accepted Cathedral's offer when Hensley called Scholl and told him that he had accepted it. He also confirmed in writing that the terms looked reasonable. Because of this telephone call, Cathedral sent laborers and equipment to the drill site. The next day as Cathedral was spudding the well, Stetson attested that it had read and agreed to be bound by Cathedral's terms and conditions.

Now, Stetson says that it did not read nor did it agree to those terms and conditions, it does not say directly that Berg lied on Stetson's credit application or that it stopped Cathedral from continuing with drilling the well. A party is presumed to have read and understand a contract when it signs it.[3] Stetson does not say that Cathedral lied to it or misrepresented terms. The circumstances as they existed at the time the agreement was made compel that Stetson acceded to Cathedral's terms and conditions. Stetson has offered no explanation for watching and cooperating with Cathedral's drilling if it did not understand that they had a deal.

Stetson says that it did not agree to only the terms that in these circumstances favor Cathedral. Agreement can be inferred by the objective behavior of the parties – what they said and did – and not on their current preferred state of mind. Cathedral worked for several weeks,

---

[1] *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 285 ( Tex. App. – El Paso 1991), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 218 (Tex. 1992).

[2] Id.

[3] *Upton v. Tribicock*, 91 U.S. 45, 50 (1875); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962); *In re McKinny*, 167 S.W.3d 833, 835 (Tex. 2005); *National Property Holdings, L.P., v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015).

and then Stetson paid it for part of that work based on the pricing structure of the proposal. The proposal – including the terms and conditions – governs this dispute.

3. *Bargained Benefits.*

Cathedral agreed to drill to the bottom targeted by Stetson in exchange for payment under Cathedral's terms and conditions. These include exculpation of liability for most non-egregious torts, denies express and implied warranties, and negates Cathedral's having guaranteed results. In a twist, Stetson says the dispute is whether Cathedral substantially performed in drilling the well it was hired to drill.

Cathedral was hired by Stetson after it approved the drill plan that was dependent on the accuracy of Stetson's original well-bore surveys. It did not hire or later ask Cathedral to conduct its own surveys of the old well or to evaluate the validity of the original surveys of the well. Stetson bargained for the well it got. It got a producer just not as good a producer as it would have had Stetson given Cathedral the correct data for the location. Its errors cannot now be charged to Cathedral's account.

Stetson says that Cathedral should have fully revised its plan once it realized the magnetic-declination error. Cathedral told Stetson that the surveys were wrong, but that it could still reach the targeted bottom-hole location. Stetson did not stop Cathedral's drilling. Stetson did not negotiate for its version of the contract that it now wishes that it had. It did offer to pay Cathedral more for data-reconciliation. It has no unmet benefit.

4. *Conclusion.*

These claims are acrid with the syndrome customary when the hard hats have done their best and it did not work as hoped, one company sends in the green eye shades to pick at the debris. Stetson may be unhappy with what it paid for Cathedral, but Cathedral does not have to confer a benefit that it did not promise. Stetson will take nothing from Cathedral.

Because Excelsior Resources, Ltd., and R & R Royalty, Ltd., were not a party to the contract and no longer assert claims against Cathedral, they will take nothing from Cathedral.

Signed on August 31, 2016, at Houston, Texas.

Lynn N. Hughes
United States District Judge